LEHMAN MOORE, appellant,

v.

ROBERT B. S. DIAMENT, THE FIRST NATIONAL BANK OF CAMDEN and WILLIAM BENNER, respondents.

Where one, who has filed a bill to enjoin the sale of property, asked to have the property left in his custody during the pendency of the litigation, upon terms that he return it when so ordered, the court can make an affirmative order compelling him to return or pay the value of the property.

On appeal from a decree advised by Vice-Chancellor Bird, whose conclusions follow :

This suit is instituted to settle the rights of certain creditors of Hammell to the goods and chattels named in the bill. The complainant claims them under a bill of sale, and the defendants, Diament, the First National Bank of Camden, and Benner, claim them under levies, upon executions issued upon confessed judgments. The dealings between the complainant and Hammell, which ripened into the bill of sale, will appear in the recitals hereafter. It will be quite difficult to so formulate a statement as to fully express all that may be justly implied from the transactions between these parties, Moore and Hammell.

The defendant Hammell was a drayman, owning fourteen drays, and generally twenty-four to twenty-six horses and harness, and other things necessary to carry on such business.

Moore went into Hammell's employ in the year 1871. He then had, or he claims he had, $500. This he placed in the hands of his brother, but when he cannot tell. Hammell paid Moore $15 a week for his services from 1871 to the year 1879. During this interval Moore claims that he made $2,400 by investments in Pennsylvania railroad securities, and $600 out of some oil stock. During all the period from 1871 to January 1st, 1879, Moore made out bills for Hammell, and after the second year, in addition, would take orders to the foreman, and

Moore *v.* Diament.

occasionally collect a bill. That is all he did. After January 1st, 1879, he says:

"I did the same, but worked harder, because I felt that I had more responsibility, and that I was doing that for myself, and not Mr. Hammell only."

Moore says that on January 1st, 1879, he and Hammell entered into a copartnership in this dray business. He says that he proposed the partnership to Hammell, and asked him if it would be agreeable, and that Hammell replied:

"That it would be agreeable, and that he would be very glad too, as he had other business to attend to; that he and Mr. Brown expected, if they could get a suitable place, to go into the wholesale grocery business, and his time would be so taken up that it would be necessary for some one equally interested to look after the business; so, under the former arrangement, I agreed to go in with him; I was to pay him $5,000 for the one-half interest in the business; I paid him $3,000 in cash, and the balance out of the profits of the business."

There was no estimate made of the value of the horses, mules and wagons. Moore says that Hammell said that they might not be worth that much money, but "he considered the business worth some good will, not stating any amount." He produced a receipt signed by Hammell, dated January 10th, 1879, for $500, "on account of half interest in teams and business, consisting of twenty-four horses, fourteen wagons and all double heavy harness." He says he paid $1,500 on the 13th of the same month, and $1,000 on the 18th. For the last two payments he took no receipts. He says that a little over $1,800 was paid out of the profits of the business for the first year, ending December 31st, 1879. The balance, about $186, was paid out of the profits of the business the following year, leaving a balance due him of over $2,000.

It appears that Moore had the whole $2,000, which comprised the first two payments by him, at the time when he made the first payment of $500; he had it in his house and had had it there four or five years; and I infer he also had by him $300 additional, for he says this, too, he had had by him three or four

years, and had kept it in the cellar.    According to his statement, then, he really had in his own possession and unemployed about $2,300 at the time he made the first payment of $500, yet he only paid the $500.    Then in a few days he paid $1,500 more and takes no receipt, still retaining $300 of his funds unemployed, and afterwards adds that sum to $700 which he says he borrowed and paid to Hammell without taking any receipt.

This is the substance of the statement made by the complainant, showing how the copartnership was formed and how he paid the alleged consideration.

According to his statement he continued to do about the same work after the formation of the copartnership that he did before, when he only received for the like services $15 per week.

It is important to observe that there was nothing said or done to indicate to the public that the complainant had any interest in the business.    The business had been carried on for years in the name of Hammell, and Moore says the agreement was that it should be carried on still in his name.    And it was so carried on in every transaction except in five or six cases; and in those, from all that I can gather, the transactions were exclusively with Hammell himself, so that the public was not informed of the act done.    These were dealings between Hammell on the one hand and a firm of which Hammell was a member, by the name of Hammell & Mellor.    This firm sold to Hammell certain goods, and the bills were receipted by Hammell in the name of Hammell & Moore.    These receipts were given towards the close of the copartnership and after the formation thereof about two years. Moore says that it was agreed that the business should be carried on in the name of Hammell because Hammell did not want a neighbor by the name of Marshall to know that he had taken a partner, since Marshall himself had been anxious to be a partner with Hammell, and yet Moore leaves the impression that Hammell told Marshall of the partnership in a few days.        :

I cannot but conclude if a partnership was formed, or if Moore had any interest whatever in the goods and the business, it was the intention of the parties to keep the partnership, or such other interest as may have been created, a secret.    Besides the above

fact, that the parties had an understanding that it should not be published, it is very suggestive that they kept no books of account. We have here two men doing business as partners, the profits of which are several thousand dollars a year, carrying it on in the name of one, without the slightest evidence to show Moore's interest in those profits in case of his death, and without the slightest evidence to show his interest in goods and chattels except the receipt for $500. And in case of Hammell's death Moore had nothing by which he could establish any payment of interest beyond the $500.

I say there were no books of account; but it is said as between themselves they have the equivalent of books in the numerous slips of paper produced. Moore says that Hammell kept all the instructions of the concern on slips of paper, by which a settlement was made, and the balance due to the one or the other ascertained and exhibited on the paper. He produces a large number of such slips or bits of paper, some of them being note paper of the ordinary size, while some of them are pieces of blank leaves of day-books or ledgers, two or three or four inches in width, while some others are plain bits about three or four inches square. In some instances the whole week's work is presented on a single piece and in many on two or more. It is due to complainant that one or two of these be given. I will copy Exhibit No. 8, which was offered to show the transactions for the week ending February 14th, 1880. On one side of a half sheet of note is:

|  | "February 14th, 1880. |
|---|---|
| Theodore | $7 00 |
| Andrew | 6 00 |
| Shaffer | 3 25 |
| Blange | 8 00 |
| Dwaull | 9 00 |
| Johnson | 9 50 |
| Brown | 8 00 |
| Jackson | 12 00 |
| Gale | 10 00 |
| Chick | 10 00 |
| Wolf | 10 00 |
| Stanton | 15 00 |

Moore *v.* Diament.

| | |
|---|---|
| Harris | $15 00 |
| Martin | 10 00 |
| J. Wood | 8 00 |
| | 3 00 |
| A. Jenkins | 10 00 |
| | $153 75 |

February 14th."

On the other side is:

| | |
|---|---|
| Wages | $153 75 |
| B. & P. | 92 14 |
| Camden | 93 25 |
| Carson | 46 94 |
| H. H. | 15 00 |
| Atlantic | 18 00 |
| | |
| L. Moore | $5 00 |
| L. Moore | 112 60 |
| Sailor. | 90 53 |
| Moore | 15 96 |
| Moore | 25 88 |
| Moore | 1 50 |
| | $251 47 |
| Stanton | $186 13 |
| | $40 69 |
| | 226 82 |
| H. H. | $5 50 |
| | $483 79 |
| | 419 08 |
| | $64 71 |
| Drew | 24 71 |
| H. H. | 40 00 |
| John | 6 00 |
| Due from H. H. | $46 00 |

February 14."

Moore v. Diament.

The statement for the next week, being Exhibit No. 9, is on two slips or bits of paper. The general characteristics are like those given above. In the list of items like the one given above, commencing with "wages," is the additional item "hay, $5.04," and "discount, 60," and "Seifert, $15." The totals are thus used producing such balance as appears:

| | | |
|---|---:|---:|
| Moore | $267 | 75 |
| Stanton | 69 | 60 |
| | $437 | 35 |
| P. D. H. | 3 | 11 |
| | $440 | 46 |
| | 458 | 11 |
| Due H. H. | $20 | 76 |
| | 3 | 11 |
| | $17 | 65 |
| | 3 | 71 |
| | $13 | 94 |

February 21st.

Exhibit No. 10 is quite similar. Under the list beginning with "wages" there is an item of "discount, $1.65." The totals are thus used:

| | | |
|---|---:|---:|
| | $598 | 18 |
| | 528 | 80 |
| | $73 | 38 |
| Tickets | 12 | 50 |
| | $60 | 88 |
| Cash | 30 | 00 |
| Due from H. H. | $30 | 00 |
| Less | 5 | 00 |
| | $25 | 00 |
| Less tickets | 25 | 00 |
| | 00 | 00 |

February 28th.

Exhibit No. 12 closes thus:

|  |  |
|---|---|
| | $535 46 |
| | 508 82 |
| Cash............................................................................. | $26 64 |

without more, not saying to whom the balance is due, or from whom.

On Exhibit No. 13, under the list commencing with " wages " as above, is this item, " cash, $25.25," additional.   The balance due on this paper is expressed thus:

|  |  |
|---|---|
| Due H. H............................................................................. | $83 87 |
| March 22d, ticket................................................................ | 12 50 |
| | $96 37 |
| Less Benner's check............................................................. | 34 60 |
| | $61 77 |

Exhibit No. 14 has some characteristics of its own.   In the list beginning with " wages " is " discount, $1.37," and " cash, $28."   Then the balance is attained by these figures:

|  |  |
|---|---|
| | $827 24 |
| | 490 48 |
| | $336 76 |
| Seifert............................................................................. | 100 00 |
| | $236 76 |
| Bills................................................................................ | 71 24 |
| | $165 52 |
| October 2d.......................................................................... | 61 71 |
| | $103 75 |
| October 6th......................................................................... | 91 75 |
| Due from  H. H................................................................. | $195 50 |
| Ridgeway........................................................................... | 6 98 |
| Due from  H. H................................................................. | $202 48 |
| Less  cash........................................................................... | 15 00 |
| Due from  Hammell.......................................................... | $187 48 |

After the first few exhibits, appears in the list, with the item "wages," the letter "C," with small items, as "$15.48," opposite, and also the word "drawer" in with other items of a few dollars (less than $15) up to $30, $40, and still higher.

I have presented these statements and results of statements for the purpose of showing why I have said that it seemed to be the desire to keep the relations of these parties a secret, in case there really was any other relation between them than master and servant or employer and employed. I can discover nothing on any of these papers, (except the five or six above referred to), that in the least distinguishes the complainant from any other man named on them. All inferences and deductions which are sought to be made in favor of Moore can as surely and as strongly be made in favor of Sailor, or Stanton, or Wood, or Martin, or Wolfe, or any other man who is named. The fact that in the footings and balances it is said "due from H. H." or "due to H. H.," raises no presumption whatever that the balance was due to Moore or from Moore rather than to or from some one else. Indeed, the account being with Moore, as he claims, and he being present, as he swears, I think, if there can be a presumption of any kind from the papers themselves, such presumption inevitably is against the complainant. Moore swears he became a partner in the business, and yet to all the world, as I read the exhibits, amounting to nearly one hundred, he acted simply as an agent or employee, as did Sailor, Stanton, Williams, Coffin and all the rest. He seems to have been on precisely the same level with them. There is nothing to show that he exercised any other rights or authority than they did. His name always appears on these papers in the same category with theirs, and I think in no instance otherwise. Take, for example, Exhibit No. 24, and we have these words and figures :

| | | |
|---|---:|---:|
| Moore | $567 | 97 |
| Sailor | 288 | 72 |
| John | 710 | 82 |
| | $1,561 | 51 |
| | 1,527 | 66 |
| Due from H. H. | $39 | 85 |

Moore *v.* Diament.

| | |
|---|---|
| Due from H. H , May 29th.................... ............................... | $1,097 96 |
| Due from H. H., May 29th................................................... | $1,137 81 |
| Less for tickets................................. ............................... | 25 00 |
| 14th and 17th, H............ ............................................... | $1,112 81 |
| June 5th, 1880, June 12th, due H. H........ .............................. | 188 71 |
| Due from H. H................................................................ | $924 10 |

What is there in this to show to whom these sums or any of them were due? Moore was by and often must have seen Hammell write " due H. H.," or " due from H. H.," but he never had him write " due to L. Moore," although his name appeared, as given above, on every paper as an agent or employee collecting large sums of money every week and paying them over, without protest, to Hammell. If Moore was a partner or had any other interest in the business such as the above-named receipt would imply, there is no reconciling his conduct, except upon the theory that the parties were careful to conceal the fact from public view, for some unlawful purpose.

Again, and on the same point, Moore says that it was part of the agreement that each should have $15 per week for his services. He says that he got his $15 out of the money which Hammell placed in the drawer. Hammell, however, charged the business with his own $15 per week in a distinct manner, as appears on the papers, while it nowhere appears that Moore was paid one cent. In many instances it appears that different sums, from less than $15 to much above, went into the drawer, whilst in many others it does not appear that any at all did.

All this, perhaps, does not prove that there was no partnership or other relation between Moore and Hammell, beyond master and servant, but it does convince me that there was a studied effort on the part of Hammell to conceal that relation, and that Moore most fully assented thereto. There must have been some design in all this, hostile to creditors and obnoxious to good morals. Who can believe that Moore would have allowed Hammell to retain the title to at least $5,000 of property in his own individual name and to deal with it as his own, and also to retain for so long a period of time the entire profits of the busi-

ness in his own hands, without the slightest acknowledgment that would avail him in law or equity, unless there was a motive underlying all, that would not bear the light? It seems to me that every disinterested mind must incline to the conviction that Hammell designed mischief and that Moore was in collusion with him.

Look, again, at one of the five or six bills of goods above alluded to, and I think the conviction of illegal designs will be strengthened. It is true the complainant points to them as full proof of the partnership. I point to them for a different purpose, to show the collusion—to show that Moore knew of the concealment and must have known it was for some unworthy purpose. This bill, Exhibit No. 79, is dated June 30th, 1881, and reads: " Messrs. Hammell & Moore, Bought of Hammell & Mellor." Then follows a bill of meal and bran amounting to $114.95, and the words " Rec'd payment, Hammell & Mellor."

The names " Hammell & Moore " and " Hammell & Mellor " are in Hammell's handwriting. The financial crisis in Hammell's affairs was approaching. He wanted a partnership, it may be, but for a purpose. He did not want it known. Hence " Hammell & Moore " deal with " Hammell & Mellor " by the hand of Hammell alone; but with all the rest of the world Hammell deals, not as Hammell & Moore, but as Hammell alone.

As to the same bills made out by Hammell to " Hammell & Moore " and receipted by him in the name of " Hammell & Mellor," it is quite worthy of attention that they are inconsistent with the fact in this, that Moore swears the business was to be carried on in the name of " Hammell," and not " Hammell & Moore." According to Moore's statement it was expressly agreed that his name should not appear.

It will be seen that I have not sought to determine whether or not a partnership was formed between Hammell & Moore, but rather to determine the effect of their relations to each other upon the rights of creditors. I am considering the rights of the respective creditors of Hammell, including Moore as a creditor. And in this case I think it matters not whether Moore be con-

sidered as creditor of Hammell as an individual or of Hammell as the representative of Hammell & Moore.

Thus matters stood until the year 1881 was well advanced. Hammell was, to all outward appearances, dealing with the world as he had been for very many years previously. So far as the world knew of Moore, he was the servant of Hammell, as he had been for seven years anterior to the year 1879.

On November 12th, 1881, Moore says he and Hammell had a final settlement, and that his half of the profits was $3,310.59, which was reduced, by the discovery of an error, to $2,958.47. This included all the business for the year 1880 to November 12th, 1881. Moore had received nothing but his $15 per week. Moore says:

"I then told him if he would buy me out I would sell out to him clear and clean for just what money I had in the concern, and would run the business on a salary that might be agreed on between him and me until such time as he was able to take charge of the business himself; if he wanted me no longer, I would step out without hard feelings towards him; he said no, he would prefer to have things continue as they were, and have Mr. Taylor draw up the proper papers of settlement; he did not seem to want to do that; I then wanted him to consent to give me a first-class mortgage for all money that was due me, in the place of the bill of sale spoken of; he did not seem to want to do that; I then proposed for him to give me a judgment bond, and that I would not push him if he should get in a tight place, as long as no one else did; if no one else ever pushed him, I never would; he didn't seem to be willing to do that; so he agreed to give me the bill of sale as before stated."

He cannot give the date of this conversation, except that it was the latter part of November. He says:

"I was anxious to have this settlement made because Mr. Hammell's health was bad, and I thought he was liable to die at most any time."

He also says that he saw Hammell about November 21st, and adds:

"It had been intimated to me, just the week previous, that he had some financial difficulty of some kind; I asked if it was so, and he said it was not;

Moore v. Diament.

that he had no trouble of any kind, either financially or otherwise; that he didn't know of anything to give him any trouble in that direction."

However, Moore went to Hammell's physician, and inquired about his health, and learned that—

"Hammell appeared to be a man with a terrible weight on his mind of some kind, and asked me [Moore] if I knew of anything that would probably worry Hammell relative to his business, between him and me, or anything else; I told him I knew of nothing that would be likely to cause him trouble."

On the 23d of November he went to Hammell's house with Mr. Taylor, and "Mr. Taylor was instructed to draw up an article of partnership and a bill of sale." The parties met again, November 28th, Mr. Taylor and George W. Moore, the brother of the complainant, also being present. He says that on this day papers were signed and afterwards destroyed. He says Hammell claims to have discovered a mistake. Moore says:

"He told my brother that he and I had been in business all this time and he had been receiving all the money; he was sorry it had run so long unsettled, and was willing and anxious now to have it settled up at once, and was willing to do anything that was right to make me safe."

He wanted Hammell to give him a bond and warrant of attorney, but Hammell refused. He also proposed that Hammell should give him a bond and mortgage.

George W. Moore was sworn. He was present at the interview last referred to. He says he conversed with Mr. Hammell, Mr. Taylor and Moore upon the best plan of making his brother secure. He says:

"My brother told him that if he could pay him the balance due to him, that would be satisfactory, and I think named the amount; Mr. Hammell said that he was not prepared to do that at that time; my brother then proposed a judgment note, and Mr. Taylor a chattel mortgage; Mr. Hammell refused to give the judgment note, and I said I didn't think a chattel mortgage was good in Pennsylvania."

I have given these interviews in detail because Moore says he did not know that Hammell was embarrassed; whereas I conclude, from what appears above, that he did know, or had

abundant reason for his anxiety. He had trusted Hammell for two years without even the slightest promise in writing, but at this juncture he insists on a bond and warrant of attorney, or a bond and mortgage, or a chattel mortgage, and accepts a bill of sale of all the goods and chattels used in the business, and would not be content until he was thus secured.

I think that the correctness of this conclusion will be impressed upon every one who considers the foregoing statements in connection with the fact that at this time Hammell's liabilities to others besides Moore exceeded $25,000.

But, following Moore and Hammell further, it appears that on December 2d, 1881, Hammell executed a bill of sale to Moore for his undivided one-half interest in the horses, wagons &c. This, it was conceived, did not sufficiently secure Moore, and the papers were destroyed, and a new bill of sale executed, conveying the entire property in the horses and wagons to Moore, with a guarantee that the title thereto was in Hammell, and that he had the right to sell. At the same time articles of copartnership were entered into. In these articles is a clause which I cannot understand, except upon the theory that these parties were then and had been willing to lend themselves, each to the other, for illegal and fraudulent purposes. I refer to the clause in these words, viz. :

"3d. That said partnership shall continue under the name of Horace Hammell, as heretofore."

Why not let the public know the whole truth, the exact condition of things? Why continue the deception? It seems to me that this is one of those false badges or tokens which the law condemns. Look at it from what standpoint I may, the whole scene is disclosed by the constant effort at concealment. Creditors are to be blinded, and put off their guard.

The said business is not only to be carried "on under the name of Horace Hammell as" theretofore, but was expressly stipulated.

"4th. That said Lehman Moore shall suffer and permit the said partnership

Moore v. Diament.

to use all of said personal property in the business of said partnership, but that the same not in anywise be considered partnership property, nor taken into account as the assets of the firm."

The proofs assure me that Moore knew Hammell was in great distress, and could not stand the storm, and yet he solemnly aids him in hoisting a false signal. I cannot find, and do not believe there is a case that gives countenance to such agreements when creditors have been before the court, and especially when the fraud-doer is complainant, and invoking the arm of the court to his protection. I speak with reference to all the circumstances of this case. From the beginning, if the complainant is believed, Hammell presented to the world a false front, and the complainant for years encouraged the delusion.

But the complainant says no creditors were deceived, because none of them traded or dealt with Hammell on account of the partnership. That may be very true—most likely is; for I am not satisfied that any of them knew of the partnership, except Marshall, and to say that he did until after the 6th of December, 1881, is quite inconsistent with Hammell's desire for secrecy. But the real question is not whether the creditors of Hammell dealt with him on account of this partnership business, so called, but whether that part of his business was so conducted as to obtain for him a false credit generally. This business, including good-will and goods and chattels, was valued at $10,000. There can be no doubt but that that went largely to make Hammell's credit good in every one of his transactions with bankers, merchants, and all others. It seems to me that if the courts were to sustain this transaction, every man would be justified in doing business in his own name, while the absolute title to all his stock in trade could be secured clandestinely in another. As I have said, I do not think any of the cases, since *Twyne's*, go so far as to tolerate the actions of Moore and Hammell. I do not think these transactions were *bona fide.* For proof of this, consider Hammell's entire control of Moore and the business, from the commencement to the conclusion.

Moore seemed at no time to have any voice in the concern. If he was a partner at all, he was not only a secret but a silent

partner. When the crisis came and Hammell consented to make a settlement, it appears that he dictated the terms, certainly the amount to be allowed Moore. And so potent was his dictation that after one result had been arrived at and the papers executed and delivered, as Moore says, Hammell, as I understand, demanded further reduction and obtained satisfaction. Then it was that Moore obtained a letter from Hammell to Mr. Taylor, directing the delivery of the bill of sale and articles of copartnership. For fifteen days Moore wanted possession of the papers (the bill of sale and articles of copartnership), but Hammell prevented it. Not once can I find that Moore asserted his pretended rights.

I conclude, therefore, that there was not that *bona fides* on the part of Moore which is called for by the authorities. *Sayre* v. *Fredericks, 1 C. E. Gr. 205 ; Merchants Bank* v. *Northrup, 7 C. E. Gr. 58, 8 Id. 582,* and consequently that the judgment creditors are entitled to the benefit of their levy on the goods in question. This is my view of the case, even though there was a delivery of the bill of sale at the time of its execution.

Hence it is quite useless for me to determine whether there was a delivery, in fact, of the alleged bill of sale, or not.

I will advise a decree in accordance with these views, sustaining the claims of the judgment creditors by virtue of their executions and levies as against the complainant's claim.

*Mr. H. A. Drake,* for appellant.

*Mr. P. V. Voorhees,* for respondents.

The opinion of the court was delivered by

REED, J.

Horace Hammell confessed judgments severally to the respondents, the defendants below. Upon these judgments executions were issued, and a lot of property used in the business of draying was levied upon as the property of Hammell. Moore then filed his bill in this case against the said judgment creditors to restrain the sale under said executions. Moore claimed by his

'bill that he, and not Hammell, was the owner of said goods. He sets up that Horace Hammell was engaged in the business of drayman in Philadelphia, with his principal stables in Camden, where he had a large number of mules, horses, wagons &c.

He says that about June 1st, 1879, he, Moore, having been employed as the clerk and book-keeper of said Hammell, pur-chased a one-half interest in the business for the sum of $5,000, $3,000 of which he paid in cash, and the balance was to be paid out of the profits of the business.

He further says that he permitted his share of the profits to remain in the business until June 1st, 1880, when it amounted to over $3,000, and on June 1st, 1881, it amounted (after deducting $15 a week for living expenses) to $4,500. That on the 6th of December, 1881, Hammell sold him the stock used in said partnership business for the sum of $2,958.47, the amount then due after payment of the $2,000 yet due for his interest in the partnership.

By virtue of this agreement for the sale of the said stock, Moore claims title thereto against the judgment creditors of Hammell, and asks the restraining order of the court of chancery to protect his property against a sale under their executions.

The vice-chancellor refused this relief. In a very full and exhaustive review of the facts surrounding the transactions between Moore and Hammell, he found that the alleged partnership and sale was a fraudulent contrivance to defeat the creditors of Hammell. In this conclusion I concur. There was no written evidence of the existence of the partnership until December 6th, 1881, at the date of the alleged sale. Hammell was then hopelessly insolvent, and soon after gave the bonds with warrants to confess judgments, upon which judgments were entered. The existence of any partnership was not revealed by any change in the business, in any sign, or any important revelation, by Moore or by Hammell.

The evidence of the payment of $3,000 in cash by Moore to Hammell is not credible, under the circumstances. He has a receipt from Hammell for $500. The balance he says was paid within a few days thereafter. He had previously been working

for Hammell for $15 a week, and supporting himself and wife. He says that he had made some money in speculations in oil and railroad stock and in commissions on the sale of one or two houses. But Ridgway, through whom the speculative enterprises were conducted, is not called. There is no testimony to corroborate his story as to the source of this large sum, and I am constrained to regard it as incredible. In this most important point of the complainant's case, such corroborative evidence as could, if the story was true, have been produced, or its absence accounted for, is entirely neglected. I conclude that the arrangement of December 6th, 1881, was fraudulent, and that the appellant was not entitled to relief.

The counsel of the appellant complains, however, that the decree, instead of merely dismissing the bill and dissolving the preliminary injunction, proceeded to grant affirmative relief to the respondents. A glance at the proceedings taken during the progress of the cause will disclose facts which gave the court of chancery the right to deal with the subject-matter of the litigation. The bill prays that a receiver may be appointed to receive the moneys arising from the sale of the chattels, in lieu of an injunction of the sale, if the chancellor should deem such course equitable. Theodore B. Gibbs, the sheriff of Camden county, was appointed receiver. On the 10th of January, 1882, on application of the counsel of the complainant, it was ordered that the complainant should have leave to use the chattels &c., in the possession of the receiver, upon terms that he give bond, with security, for the return of them, when ordered by this court, in as good condition and repair as the same now are, loss by unavoidable accident alone excepted, and that said Moore should be at the expense of keeping, caring for and keeping in repair all of the said goods and chattels during all the time of his using the same. Under this order, made at the instance of the appellant, the property was delivered to him, to be used until the further order of the court. By this conduct on the part of the appellant, he submitted himself to the control of the court, in respect to the use and return of the goods. The court could not do otherwise than to make such an order as would place the judg-

ment creditors in the position they would have occupied had the chattels not been delivered to the appellant. The terms upon which they were handed over to Moore were designed to effectuate that object.

The court of chancery had the right to make such order as would place the parties *in statu quo.* The decree, as made, how- ever, after reciting that one or more of the horses had been sold or disposed of, ordered that appellant pay to the receiver the sum of $4,683.50, the value of said chattels, as appraised by the appraisers, duly appointed by Gibbs, with interest from the time the goods were delivered to said appellant. Since then it has been also ordered that the said Moore, within three days after the service of a copy of the said order, return to the receiver all the chattels received by him under the original order, and the receiver and sheriff are by said order directed to appraise and sell the same.

I am constrained to adopt the conclusion that the order that Moore should pay the appraised value of the chattels with, in- terest, during the term he was using them, is too stringent.

The obvious reason why they were handed over to Moore was to preserve the chattels, and to avoid the expense of their keep- ing. The degree of his responsibility was fixed by the terms of the order by which he got the possession.

He was to feed the animals, and care for the other chattels, and was to be allowed no reduction for the usual wear, but was to be allowed a deduction for any loss resulting from unavoidable accident. He is to account to the receiver for the value of the goods at the time they came into his possession, less loss of any by unavoidable accident. The appraisement made by the sheriff's appraisers is not evidence of this value. If the property has been sold, then the difference between the proceeds of such sale and such value of the property as ascertained is the standard of Moore's liability.

I think the decree should, in this feature, be modified, and the cause be remitted to the court of chancery for an ascertainment of the value of the goods as above indicated.

*Decree unanimously reversed.*